UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

HYDRAULICS INTERNATIONAL, INC.
132 South 1400 West
Salt Lake City, Utah 84104,

      Plaintiff,

v.                                                                                Case No. 20-CV-371

AMALGA COMPOSITES, INC.
10600 West Mitchell Street
West Allis, Wisconsin 53214,

      Defendant.

## COMPLAINT

Plaintiff Hydraulics International, Inc., by its attorneys, Halloin Law Group, S.C., complains of Defendant Amalga Composites, Inc., as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Hydraulics International, Inc. ("Hydraulics") is a Utah corporation, with its principal place of business in Utah.

2. Amalga Composites, Inc. ("Amalga") is a Wisconsin corporation with its principal place of business, and registered agent's office, located at 10600 West Mitchell Street, West Allis, Wisconsin, 53214.

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that the parties are completely diverse and the amount in controversy

exceeds $75,000.00. Hydraulics is a citizen of Utah, while Amalga is a citizen of Wisconsin.

4. The Eastern District of Wisconsin is the proper venue under 28 U.S.C. § 1391(b)(1) and (2) because Amalga resides in West Allis, Wisconsin, and a substantial part of the events and omissions giving rise to the claim occurred in the Eastern District of Wisconsin.

5. In 2017, Hydraulics needed to identify a new manufacturer which could provide fiberglass wound spools.

6. Hydraulics first discovered Amalga through its website. Representatives then called Amalga and were forwarded to Matt Brainerd, who had Utah client responsibility.

7. Hydraulics revisited Amalga's website because Amalga told Hydraulics it could rely on the information included on the website for technical specifications related to the fiberglass wound spools.

8. Hydraulics also researched Amalga's LinkedIn page.

9. After the initial contact with Amalga, Hydraulics held ongoing discussions with principals of Amalga by phone, email, and text message.

10. On February 28, 2018, Amalga sent Matt Brainerd, its Global Account Manager, to Utah for the purpose of negotiating an ongoing relationship with Hydraulics.

11. As part of these conversations, Hydraulics explained the diameter, shape, size, performance requirements and delivery timeframe required for Amalga's fiberglass wound spools.

12. During these discussions, Hydraulics provided a forecast of longer-term production requirements and a potential for long term business relationship with Amalga.

13. Amalga representatives told Hydraulics that the prospective business relationship was a key prospective for Amalga, and that Hydraulics was a key customer.

14. Amalga representatives also told Hydraulics about Amalga's plans to initiate improvements and investments.

15. Hydraulics intended to purchase Amalga products on an ongoing basis.

16. Hydraulics planned to store Amalga's products in Utah, after which it would manufacture the downhole plugs in Utah, complete intricate machine-work on these products in Utah, and distribute them throughout the United States.

17. In June 2017, Hydraulics began purchasing Amalga's fiberglass wound spools, and in August 2017, the first production order was placed.

18. Hydraulics purchased over $300,000.00 in product from Amalga over the course of seven months.

19. While attempting to fulfill its contract with Hydraulics, Amalga provided defective product. Hydraulics' injuries arise out of Amalga's conduct.

20. Amalga's conduct created a nexus between Amalga's acts and Hydraulics' injury because Amalga failed to fulfill its obligations under the contract.

## FACTUAL BACKGROUND

21. Hydraulics has been in business for nearly 40 years. The business was established as a corporation on or around April 19, 1983.

22. Hydraulics produces precision oil and gas down-hole plug components for the oil and gas industry.

23. These items are manufactured from fiberglass filament wound spools and machined to an exact set of industry specifications.

24. Amalga is a manufacturer of fiberglass wound spools, which it produces for various customers, many of whom work in the oil and gas industry.

25. Amalga's website indicates that it develops products that provide "key applications for the oil industry."

26. Because Amalga manufactures products for oil and gas drilling, the products have to meet rigorous specifications.

27. The products must be accurately machined to a fraction of a millimeter to function properly, and still withstand high temperatures, high pressures, shearing forces, and punishing use.

28. The fiberglass wound spools are only suitable for the creation of a specific product that is only marketable to a specific customer—often a single corporation.

29. The Amalga website indicates that its fiberglass wound spools had a shear strength of 8,000 p.s.i. at room temperature.

30. In or around June 2017, Hydraulics first began acquiring fiberglass wound spools from Amalga.

31. The business relationship between Hydraulics and Amalga was extensive.

32. Hydraulics purchased fiberglass wound spools at the following times, and in the following amounts:

   a. On June 26, 2017, Hydraulics ordered $715.00 of products from Amalga as identified in PO number 12022.

   b. On August 17, 2017, Hydraulics ordered $9,576.00 of products from Amalga as identified in PO number 12080.

   c. On September 11, 2017, Hydraulics ordered $4,522.00 of products from Amalga as identified in PO number 12095.

   d. On September 27, 2017, Hydraulics ordered $74,790.00 of products from Amalga as identified in PO number 12108.

   e. On September 27, 2017, Hydraulics ordered an additional $54,511.00 of products from Amalga as identified in PO number 12109.

   f. On October 6, 2017, Hydraulics ordered $19,760.00 of products from Amalga as identified in PO number 12116.

   g. On October 17, 2017, Hydraulics ordered $4,422.00 of products from Amalga as identified in PO number 12147.

   h. On October 24, 2017, Hydraulics ordered $19,910.00 of products from Amalga as identified in PO number 12164.

   i. On November 20, 2017, Hydraulics ordered $100,436.00 of products from Amalga as identified in PO number 12188.

j. On January 8, 2018, Hydraulics ordered $13,656 of products from Amalga as identified in PO number 12224.

33. Amalga represented that the shear strength of its wound spools would only be reduced by approximately 25% when exposed to high temperature.

34. Amalga made these representations on its website and during its ongoing discussions with Hydraulics.

35. Amalga is familiar with the rigorous specifications applied to down-hole plugs used in oil and gas drilling.

36. Its customer's design requirements for down-hole plugs include a baseline of 4,000 p.s.i shear strength when exposed to high temperatures.

37. When Hydraulics first began working with Amalga, it sent Amalga specific terms and conditions that were incorporated into Hydraulics' purchase orders.

38. By fulfilling the purchase orders, Amalga accepted the terms and conditions.

39. The terms and conditions form a basis for the contractual relationship between Hydraulics and Amalga that gives rise to this lawsuit.

40. The terms and conditions are attached as **Exhibit 1** and incorporated by reference as if fully set forth herein.

41. The terms and conditions included the following relevant provisions:

    3. CHANGES: Buyer may at any time make changes in the scope ...of the goods...Substitutions or changes in quantities or specifications by Seller shall not be made without Buyer's prior written approval.

6
Case 2:20-cv-00371-JPS   Filed 03/06/20   Page 6 of 15   Document 1

4. WARRANTY:
a) Seller expressly warrants that the goods or services ordered shall be merchantable; shall conform to this order, to specifications, drawings, and other descriptions referenced in this order, and to any accepted samples; shall be free from defects in materials and workmanship; shall be free from defects in design unless the design was supplied by Buyer; and shall be fit and safe for the intended purposes.
....

5. INSPECTION; TESTING: Goods purchased under this order are subject to Buyer's reasonable inspection, testing, and approval at Buyer's destination. Buyer reserves the right to reject and refuse acceptance of goods which are not in accordance with this order or Seller's representation or warranties, expressed or implied. Buyer will charge Seller for the cost of inspecting rejected goods. Rejected goods may be returned to Seller, or held by Buyer, at Seller's risk and expense. Payment for any goods under this order shall not be deemed acceptance of the goods.

6. RECALL: In the event that a recall of the goods is necessitated by a defect, a failure to conform to the specifications, applicable laws, or any other reason within the Seller's control, Seller shall bear all costs and expenses of such recall, including without limitation, costs of notifying customers, customer refunds, costs of returning goods, lost profits, and other expenses incurred to meet obligations to third parties.
...

8. INDEMNIFICATION: Seller shall defend, indemnify and hold Buyer, its successors, assigns, employees, customers, and users of the goods or services harmless with respect to all claims, liability, damage, loss, and expenses, including attorney's fees, incurred relating to or caused by: ... b) actual or alleged defect in the services or in the design, manufacture, or material of the goods; c) actual or alleged breach of warranty; ...In the event of a claim under this paragraph, Buyer may at its option terminate this order or defer acceptance of the balance of the goods or services ordered until the claim is resolved. If Buyer is enjoined from use of the goods, Seller shall at Buyer's option, either procure for Buyer the right to continue using the goods, replace the goods with substantially equivalent goods, modify the goods

> so as to be usable by Buyer, or repurchase the goods at the price set forth in this order. This Paragraph 8 shall not be construed to indemnify Buyer for any loss to the extent it is attributable to Buyer's design, specification, or negligence.
> ...
> 17. CONTROLLING LAW: All orders shall be governed by and construed in accordance with the laws of the State of Utah...The prevailing party shall be entitled to reasonable attorney fees and costs... HII Terms and Conditions.

42. Hydraulics also created a list of Quality Requirements, or a "QR" list to supplement the Hydraulics Terms and Conditions.

43. Hydraulics provided the QR list to Amalga prior to ordering any fiberglass wound spools.

44. The QR list required Amalga to comply with "QR-03 Chemical and Physical Test Reports," "QR-04 Material Certification," "QR-16 Notification of Nonconforming Product," and "QR-17 Approval of Nonconforming Product Disposition."

45. These QR provisions require Amalga to identify, report, and correct any defective or nonconforming product.

46. These QR provisions also form a basis for the contractual relationship between Hydraulics and Amalga that gives rise to this lawsuit.

47. The QR provisions are also attached as **Exhibit 1** and incorporated by reference as if fully set forth herein.

48. In or around November 2017, Hydraulics began receiving faulty spools from Amalga.

49. The Amalga spools developed defects, including axial voids, delaminations, and other anomalies.

50. These defects made the spools completely useless for their intended purpose.

51. Hydraulics promptly notified Amalga of the defects.

52. Despite more rigorous testing and the institution of a more diligent quality control process, Amalga continued to deliver faulty spools to Hydraulics.

53. In March 2018, Hydraulics' customer, Kraken Oil and Gas, LLC ("Kraken"), experienced complications resulting from problems related to a faulty down-hole plug provided by a product manufactured from one of Amalga's spools.

54. When using plugs manufactured from Amalga spools, Kraken experienced two lab failures and two separate field failures.

55. The plugs failed to withstand the intense pressures in the oil drilling and fracking process.

56. Because of these dangerous failures, both Hydraulics and Kraken proceeded to perform tests on the Amalga spools and products derived from Amalga wound spools.

57. Kraken conducted these tests both in-house and at an independent contractor facility.

58. Hydraulics performed its tests at the University of Utah Mechanical Test Facility.

59. All Amalga spools failed to meet the specification for which they were designed. Specifically, the spools lacked the shear strength represented by Amalga.

60. The spools did not have a baseline of 4,000 p.s.i shear strength when exposed to high temperatures.

61. None of the Amalga products are marketable for Hydraulics' customers. They have no other identifiable marketable purpose.

62. Hydraulics cannot use any of the fiberglass wound spools, the down-hole plugs manufactured from those spools, or any other item derived from Amalga products.

63. Kraken and its customers have refused to use any Amalga products in their oil and gas fracking operations.

64. The Amalga products have no value to Hydraulics and cannot be sold to an alternate buyer or salvaged in any other way.

65. Hydraulics requested that Amalga take the fiberglass wound spools back.

66. Amalga refused to take back any of the Amalga wound spools.

67. Hydraulics spent a substantial amount of money to purchase wound spools from Amalga.

68. Hydraulics otherwise fulfilled all of its obligations to Amalga.

69. Hydraulics has incurred damages as follows:

    a. $205,238.89 in finished products inventory which cannot be used or sold in Hydraulics' products.
    b. $42,000.00 in unprocessed 10' Amalga spools.

    c.     $14,000.00 in Hydraulics Replacement material, spools, and products which cannot be sold.
    d.     $12,000.00 in inventory returned from Kraken as defective.

70. Hydraulics has expended additional sums to pay for the test preparation, testing, quality assurance, lost revenue, shipping, and storage of defective product.

71. The type of widespread defects present in this case entitles Hydraulics to compensatory, incidental, and consequential damages, attorney's fees and costs, and pre- and post-judgment interest.

### FIRST CAUSE OF ACTION
### Breach of Contract

72. Hydraulics re-alleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

73. In or around June 2017, Hydraulics first began acquiring fiberglass wound spools from Amalga.

74. Hydraulics informed Amalga of the technical specifications required for each of the wound spools it purchased.

75. Hydraulics relied on published properties and supplied dimensional data for each of the wound spools it purchased.

76. These specifications were also partially outlined in the Hydraulics' Terms and Conditions and QR sheets which it provided to Amalga.

77. Amalga was familiar with these specifications. The content published on its website indicated that its wound spools satisfied the specifications required by Hydraulics.

78. Moreover, Amalga confirmed that the wound spools satisfied the required specifications in its ongoing communications with Hydraulics.

79. The purchase orders, terms and conditions, QR sheets, and specifications formed a contract between Hydraulics and Amalga.

80. The terms and conditions, QR sheets, and specifications were incorporated into the contract and transactions between Hydraulics and Amalga.

81. Hydraulics spent a substantial amount of money to purchase wound spools from Amalga.

82. Hydraulics fulfilled all of its obligations to Amalga.

83. Amalga delivered fiberglass wound spools which were defective, and which did not meet any of the specifications required under its contractual obligations with Hydraulics.

84. The fiberglass wound spools did not meet the technical specifications reported on the Amalga website.

85. Amalga's failures constitute material breaches of its contractual obligations with Hydraulics.

86. As a proximate and direct result of Amalga's conduct, Hydraulics incurred damages as follows:

    a. $205,238.89 in finished products inventory which cannot be sold.

  b.  $42,000.00 in unprocessed 10' Amalga spools.
  c.  $14,000.00 in Hydraulics Replacement material, spools, and products which cannot be sold.
  d.  $12,000.00 in inventory returned from Kraken as defective.

87. Hydraulics has incurred additional damages, including but not limited to paying for test preparation, testing, quality assurance, lost revenue, shipping, and storage of defective product.

88. Hydraulics is entitled to compensatory, incidental, special, and consequential damages.

89. Hydraulics' incidental damages include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, and any commercially reasonable charges, expenses, and commissions in connection with effecting cover and any other reasonable expense incident to the breach.

90. Hydraulics' consequential damages include loss from the general and particular requirements and needs that Amalga, at the time of contracting, had reason to know and which could not reasonably have been prevented by cover or otherwise.

91. Hydraulics' business has been negatively affected because of the defective product provided by Amalga. For example, Kraken no longer purchases the same amount of Hydraulics' products.

92. One of Kraken's customers will no longer conduct business with Kraken because of the defective products.

93. Kraken has substantially reduced its business with Hydraulics because of the faulty products provided by Amalga.

94. This single loss was significant. Hydraulics invested tens of thousands of dollars over the course of six month in developing a marketable product for Kraken and its purchasers.

95. Hydraulics was forecasted to have sales of $2.5 million to $3.5 million per year with Kraken and its customers.

96. Hydraulics' sales to Kraken are a fraction of the forecasted amount.

97. Hydraulics' damages include attorney fees and costs and pre- and post-judgment interest.

WHEREFORE, Hydraulics requests that the Court grant it judgment and:

a. Award all actual, compensatory, general, special, direct, consequential, and incidental damages, including attorney fees and costs;

b. Award pre-judgment, statutory, and post-judgment interest, as available; and

c. For such additional relief as this Court deems appropriate.

## JURY DEMAND

Hydraulics International, Inc. demands a trial by a jury of twelve.

Dated March 6, 2020.

        HALLOIN LAW GROUP, S.C.
        Attorneys for Plaintiff Hydraulics International, Inc.


        s/ Scott R. Halloin
        Scott R. Halloin
        State Bar No. 1024669
        James J. Irvine
        State Bar No. 1088726

HALLOIN LAW GROUP, S.C.
839 North Jefferson Street
Suite 503
Milwaukee, Wisconsin 53202
p 414-732-2424
f 414-732-2422
shalloin@halloinlawgroup.com
jirvine@halloinlawgroup.com