# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**HYDRAULICS INTERNATIONAL, INC.,**

**Plaintiff,**

**v.**                                    **Case No. 20-CV-371**

**AMALGA COMPOSITES, INC.,**

**Defendant.**

# DECISION AND ORDER

## 1.  Facts and Procedural History

Over the span of a few months beginning in August 2017 plaintiff Hydraulics International, Inc. purchased over $300,000 of fiberglass wound spools (often referred to as billet) from defendant Amalga Composites, Inc. (ECF Nos. 23, ¶ 18; 79, ¶¶ 1, 31-65.) The first spools Hydraulics received from Amalga were allegedly cracked. (ECF No. 79, ¶¶ 92-110.) The portions of the spools that could be used were manufactured into components for the oil and gas industry. (ECF No. 79, ¶¶ 1, 111.) Hydraulics's customer, a company called Kraken, then experienced problems with the components. (ECF No. 79, ¶ 111.)

Hydraulics alleges that these failures were a result of Amalga's product not meeting its stated specifications. (ECF No. 23, ¶ 59.) It brought this action alleging breach of contract, breach of warranty, and false advertising under Wis. Stat. § 100.18(1). (ECF No. 23, ¶¶ 72-119.) Amalga moved to dismiss Hydraulics's complaint. (ECF No. 9.) The court denied that motion. *Hydraulics Int'l, Inc. v. Amalga Composites, Inc.*, 488 F. Supp. 3d 770 (E.D. Wis. 2020).

Currently before the court are several motions. Hydraulics has moved for partial summary judgment (ECF No. 55), to bar Amalga from presenting any undisclosed expert witness opinion (ECF No. 51), for leave to submit a reply in support of its motion to bar Amalga from presenting any undisclosed expert witness opinion (ECF No. 93), and to strike Hydraulics's reply in support of its proposed findings of fact (ECF No. 100). Amalga has moved for summary judgment (ECF No. 62), to exclude the testimony of Matthew Sullivan (ECF No. 64), to exclude the testimony of Randall Nish (ECF No. 66), and to strike Nish's declaration (ECF No. 90).

The briefing on these motions is complete. The court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332. (ECF No. 79, ¶¶ 3, 4, 6.) All parties have consented to the full jurisdiction of this court under 28 U.S.C. § 636(c). (ECF Nos. 6, 7.)

## 2. The Motions for Summary Judgment

### 2.1. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

### 2.2. Amalga's Reply in Support of its Proposed Findings of Fact

In support of its proposed findings of fact, Amalga submitted a reply to Hydraulics's response. (ECF No. 95.) The court's Local Rules permit a reply only to "any *additional* facts submitted by the opposing party …." Civ. L.R. 56(b)(3)(B) (emphasis added); *Arms v. Milwaukee Cty.*, No. 18-CV-1835, 2021 U.S. Dist. LEXIS 64654, at *7 (E.D. Wis. Apr. 1, 2021). Amalga separately addressed Hydraulics's additional proposed

findings of fact. (ECF No. 98.) Thus, Hydraulics moved to strike the reply. (ECF No. 100.)

Hydraulics's motion to strike (ECF No. 100) is granted and the reply filed as ECF No. 95 is stricken. *See Arms*, 2021 U.S. Dist. LEXIS 64654, at *7. Insofar as Hydraulics attempted to introduce additional proposed findings of fact in its response to Amalga's proposed facts, Amalga is correct (ECF No. 101 at 2) that this is also improper. *Lanning v. Gateway Tech. Coll.*, No. 19-CV-890, 2020 U.S. Dist. LEXIS 121446, at *1 n.1 (E.D. Wis. July 10, 2020) (citing *Pollock v. ManpowerGroup US, Inc.*, No. 18-CV-107, 2019 U.S. Dist. LEXIS 199665, at *7-8 (E.D. Wis. Nov. 18, 2019)). Although the court has discretion to consider such improper additional facts when the opposing party has had the opportunity to address them, *see Eilene A. Shimi v. Associated Fin. Grp., LLC*, No. 20-CV-1702, 2022 U.S. Dist. LEXIS 96395, at *1 n.1 (E.D. Wis. May 27, 2022) (accepting additional facts plaintiff offered in response to defendant's proposed findings of fact in light of plaintiff's pro se status), the court declines to do so here.

### 2.3. Battle of the Forms

After an internet search identified Amalga as a potential supplier (ECF Nos. 79, ¶ 7; 98, ¶ 1), Hydraulics submitted a Request for Quote to Amalga (ECF No. 59-7 at 2-10). Attached to that Request for Quote were six pages of terms and conditions. (ECF Nos. 59-7 at 5-10; 79, ¶¶ 21-24.) Those terms and conditions required a specific warranty from the seller, demanded indemnification from the seller, and stated that the

agreement would be governed by Utah law. (ECF No. 59-7 at 5-6.) The terms and conditions also stated: "Buyer objects to all additions, exceptions, or changes to these terms, whether contained in any printed form of Seller or elsewhere, unless approved by Buyer in writing. To the extent there are any inconsistencies between these terms and those written on the face of this order, the latter will control." (ECF No. 59-7 at 5.) Hydraulics's terms and conditions also included 23 "Purchase Order Clauses," the first of which stated:

> Each shipment must be accompanied by one legible copy of a Certificate of Compliance/Conformance (C of C). The purpose is to certify that the supplier's material, processes, and finished parts were controlled and tested in accordance with the applicable specifications. All material, components or other goods or services, as applicable, supplied to HII must be traceable to the Original Equipment Manufacturer, as identified on the Purchase Order. The OEM certification must be maintained by the supplier and be made available upon request by HII. The certification shall be signed by a corporate officer or other designated responsible individual.

(ECF No. 59-7 at 7.)

Amalga responded with a quote. (ECF Nos. 59-31 at 2; 79, ¶ 25; 98, ¶ 9.) Hydraulics then submitted its first of nine purchase orders to Amalga on August 17, 2017. (ECF Nos. 59-9 at 2; 98, ¶ 12.) At the bottom of the purchase order was the following: "Commencing with this order signifies supplier's acceptance of this PO and its agreement with all HII Terms and Conditions, any applicable HII Quality Clauses. The following documents are available at www.hydintl.com and are applicable to this purchase order and incorporated herein: (1) HII-Purchase-Order-Terms-and-Conditions

http://tinyurl.com/73k34nf; (2) HII-Purchase-Order-Clauses. http://tinyurl.com/yajf5czs." (ECF No. 59-9 at 2; *see also* ECF No. 98, ¶ 13.) The links are not functional; it is unclear if they linked to Hydraulics' terms and conditions at the time it sent the invoices to Amalga.[1]

Amalga argues that "Hydraulics has not demonstrated that it ever sent Amalga its proposed Terms and Conditions." (ECF Nos. 94 at 6; *see also* 81 at 6 ("Hydraulics' Purchase Orders did not even attach Hydraulics' terms and conditions – the Purchase Orders merely reference them and then list websites where they are purportedly available.").) However, in responding to Hydraulics's proposed findings of fact, Amalga does not dispute that Hydraulics's purchase order contained its terms and conditions. (ECF No. 79, ¶¶ 23, 24; *see also* ¶¶ 22, 32, 36, 40, 44, 48, 52, 56, 60, 64 (Amalga failing to dispute that the purchase orders incorporated Hydraulics's terms and conditions).) Thus, the court accepts Hydraulics's undisputed proposed findings of fact that its request for quotation and purchase orders contained its terms and conditions.

Amalga responded to Hydraulics's purchase orders with a Sales Order Acknowledgment. (ECF No. 59-10 at 3.) Attached to that document was a page of fine-print terms and conditions. (ECF No. 68-2 at 3.) The first term included the following:

---

[1] In discussing the links, Amalga repeatedly cited to "ECF No. 59-1." (ECF No. 81 at 6; 94 at 6, 7.) The document filed as ECF No. 59-1 is the 109-page deposition transcript of Jack DeLuca as Amalga's corporate representative under Rule 30(b)(6). Amalga does not cite to any specific portion of the document. Thus, it is unclear how Amalga contends that it supports its assertions.

Any term, condition and/or provision of customer's order which is any way inconsistent with these terms shall not be applicable hereto or binding upon seller. Customer, by accepting any goods covered by these terms, shall conclusively be deemed to accept these terms. Seller's failure to object to terms, conditions and/or provisions in any communication by customer will not be a waiver of any terms contained herein. If this order confirmation is issued in response to a prior purchase order or other writing submitted by customer to seller, and such form contains terms, conditions and/or provisions which are additional to, different from or vary these terms, seller's acceptance shall be expressly conditioned upon customer's assent to these terms.

(ECF No. 59-10 at 4.) Amalga's terms included a disclaimer of warranties, a one-year limit for any claims, and a choice of law provision subjecting the agreement to Wisconsin law. (ECF No. 68-2 at 3.) An integration clause stated,

No additional [sic] to or modification of any provision in this contract shall be binding upon seller unless made in writing and signed by a duly authorized representative of seller. No course or dealing or use of trade or course of performance shall be relevant to explain or supplement any terms expressed in this contract.

(ECF No. 59-10 at 4.)

The parties do not argue that there is a material difference between Wisconsin or Utah law regarding this battle of the forms analysis. (*See* ECF No. 62-1 at 12 fn.1 (Amalga noting that both Wisconsin and Utah have adopted U.C.C. § 2-207)). Because the parties have not pointed to a material conflict between Wisconsin and Utah law, a federal court will apply the law of the state where it sits. *Morisch v. United States*, 653 F.3d 522, 530-31 (7th Cir. 2011) (citing *Gould v. Artisoft, Inc.*, 1 F.3d 544, 549 n. 7 (7th Cir.

Case 2:20-cv-00371-WED   Filed 09/15/22   Page 7 of 55   Document 102

1993) *Kochert v. Adagen Medical Int'l, Inc.*, 491 F.3d 674, 677 (7th Cir. 2007)). Therefore, the court relies on Wisconsin law.

The court addressed this "battle of the forms" when it denied Amalga's motion to dismiss. *Hydraulics Int'l, Inc. v. Amalga Composites, Inc.*, 488 F. Supp. 3d 770 (E.D. Wis. 2020). Although at that stage the court assessed only Hydraulics's allegations, the evidence now before the court is consistent with those allegations. Thus, the court's prior analysis holds true, and the conclusion is the same.

Hydraulics's purchase order was the offer under Wis. Stat. § 402.207. *Hydraulics*, 488 F. Supp. 3d at 774. It expressly limited acceptance to the terms of the offer. *Id.*; *see also* Wis. Stat. § 402.207(2)(a). Amalga's Sales Order Acknowledgment, which ordinarily would have been the acceptance, rejected Hydraulics's terms and said, in effect, that only its terms would control. Thus, the parties' writings did not establish a contract. *See Hydraulics*, 488 F. Supp. 3d at 774. Nonetheless, the parties proceeded as if a contract existed; Amalga shipped and Hydraulics's accepted and paid for the product. "In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of chs. 401 to 411." Wis. Stat. § 402.207(3).

Hydraulics's argument that Amalga accepted Hydraulics's additional terms when it issued a "Certificate of Conformance" (ECF Nos. 56 at 11-13; 84 at 16) is unpersuasive and unsupported. Hydraulics offers no authority to support the

proposition that, under the U.C.C., a "Certificate of Compliance" constitutes acceptance of a merchant's conflicting terms and conditions. A Certificate of Compliance serves a distinct commercial purpose. As the name indicates, it merely certifies that the goods comply with the specifications. Although the certificate confirmed Amalga's compliance with the requirements and specifications of the purchase order, it cannot be reasonably understood as an acceptance of all of Hydraulics's terms and conditions. The fact it was a writing signed by an authorized representative of Amalga and issued pursuant to a clause in Hydraulics's purchase order does not mean it was a writing that accepted any addition or modification to Amalga's terms. Issuance of a Certificate of Conformance was merely performance of a requirement of the contract, just as was supplying the product ordered.

Consequently, under the classic U.C.C. battle of the forms analysis, *see, e.g.*, *Miniature Precision Components, Inc. v. Standex Elecs., Inc.*, 571 F. Supp. 3d 955 (E.D. Wis. 2021) (citing *Northrop Corp. v. Litronic Indus.*, 29 F.3d 1173, 1174 (7th Cir. 1994)), the agreements between Hydraulics and Amalga "consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of chs. 401 to 411." Wis. Stat. § 402.207(3).

9

### 2.4. Timeliness of Hydraulics's Claims

Amalga argues that the undisputed evidence shows that its one-year limitation was a part of the agreement and entitles it to summary judgment because Hydraulics's claims are untimely.

Again, the parties do not raise a conflict of law issue as to Hydraulics's claims. Therefore, the court applies Wisconsin law. *Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 426 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits. … Courts do not worry about conflict of laws unless the parties disagree on which state's law applies."); *Third Educ. Grp., Inc. v. Phelps*, 675 F. Supp. 2d 916, 920 (E.D. Wis. 2009).

Hydraulics's terms stated: "Claims under these warranties must be made within the applicable period prescribed by statute." (ECF Nos. 68-1 at 4; 79, ¶ 71.) Amalga's terms stated: "Any action for breach of this contract must be commenced within one year after the cause of action has accrued, or it shall be forever barred." (ECF Nos. 59-10 at 4; 85, ¶ 11.) Amalga argues that these terms are not inconsistent because, although Wis. Stat. § 402.724(1) generally sets a six-year statute of limitations on claims, it permits merchants to reduce the period of limitations to not less than one year.

Simply because the statute permits the parties to agree to a one-year statute of limitations does not mean that one year is the "period prescribed by statute." The

"applicable period prescribed by statute" is six years. Wis. Stat. § 402.724(1). Thus, Hydraulics's terms established a six-year limitations period whereas Amalga's terms set that period at one year. Because the terms conflict, Amalga's one-year limitation was not part of the parties' agreement.

Nonetheless, Amalga argues that its one-year limitation applies under Wis. Stat. § 402.207(2)(b) as an "additional term" because it does not materially alter the contract. (ECF No. 62-1 at 13.) Under Wis. Stat. § 402.207(2)(a), an "additional term" becomes a part of a contract between merchants unless any one of the following applies:

"(a) The offer expressly limits acceptance to the terms of the offer;

(b) They materially alter it; or

(c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received." Wis. Stat. § 402.207(2).

Amalga argues that a change in the limitations period is not a material alteration and thus its one-year period became part of the agreement. However, the court need not consider whether the one-year limit on claims was a material alteration because Hydraulics's offer—the purchase order—expressly limited acceptance to the terms of the offer. *Hydraulics*, 488 F. Supp. 3d at 774. As such, it does not matter whether Amalga's one-year limitations period materially altered the agreement; because Wis. Stat. § 402.207(2)(a) applied, any alteration, material or not, did not become part of the agreement.

Finally, Amalga argues its "one year limitation is also an enforceable 'supplementary term' under U.C.C. § 2-207(3)." (ECF No. 62-1 at 15.) That is the extent of Amalga's argument. It cites *Dresser Indus., Inc., Waukesha Engine Div. v. Gradall Co.*, 965 F.2d 1442, 1449-52 (7th Cir. 1992), without explanation, and then drops a footnote asserting that discovery has not revealed any "genuine issues of material fact to contradict the case law cited above that stands for the proposition that time limitations are not material alterations." (ECF No. 62-1 at 15, fn.3.)

Aside from the fact that a footnote is never an appropriate way to advance or preserve an argument, *see Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009); *United States ex rel. Kroening v. Forest Pharm., Inc.*, 155 F. Supp. 3d 882, 897 (E.D. Wis. 2016), Amalga's footnote does not support any argument regarding its one-year limitation as a "supplementary term." The footnote addresses material alterations under Wis. Stat. § 402.207(2)(b) and not, as the accompanying text would suggest, a supplementary term under Wis. Stat. § 402.207(3). By failing to further develop its argument, Amalga has failed to demonstrate that its one-year limitation is an enforceable supplementary term under U.C.C. § 2-207(3). *See, e.g., Barker v. Quick Test, Inc.*, 2016 U.S. Dist. LEXIS 32755 (N.D. Ill. Mar. 15, 2016) (citing *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010)).

Because Amalga has not demonstrated that its one-year limitation provision was part of the parties' agreement, it has failed to prove that it is entitled to summary judgment on the basis that Hydraulics's claims are untimely.

### 2.5. Breach of Contract

In its amended complaint Hydraulics alleges that Amalga breached the contract because the wound spools provided did not meet Amalga's represented specifications. (ECF No. 23, ¶ 72-85.) In moving for summary judgment Amalga argues that the contract did not contain any relevant temperature specification, and therefore Hydraulics's breach of contract claim fails as a matter of law. (ECF No. 62-1 at 17.) In any event, it argues that the product failed only because it was used at temperatures in excess of its specifications. (ECF No. 62-1 at 17-18.)

In response, Hydraulics contends that Amalga's assertion that the product was used at temperatures in excess of its specifications is not supported by the evidence. (ECF No. 84 at 20.) But Hydraulics does not point to any specific provision of the contract that Amalga allegedly breached. Instead, it argues that Amalga breached the contract because the spools that Amalga delivered were all defective. (ECF No. 84 at 19.) Specifically, it argues that the products were cracked or delaminated.

Amalga has failed to show that the undisputed reason for the product failure was Kraken using the product at temperatures that exceeded the specifications.

Consequently, that argument does not entitle Amalga to summary judgment on Hydraulics's breach of contract claim.

As for Hydraulics's argument that Amalga breached the contract because the products arrived cracked, Amalga is correct that Hydraulics does not support this argument by citing any specific provision of the parties' contract. But it need not. The contract was undisputedly for specific products. When a party contracts to purchase a product but it arrives cracked or in an otherwise defective condition, a jury may reasonably conclude that the seller breached the contract to provide the product. *See Wis. Pharmacal Co., LLC v. Neb. Cultures of Cal., Inc.*, 2016 WI 14, ¶82, 367 Wis. 2d 221, 260, 876 N.W.2d 72, 90 (finding that "the provision of a defective ingredient constitutes a breach of contract"). The fact that Hydraulics was apparently able to use portions of the product, and whether and to what extent Amalga provided Hydraulics with credit for the portion of the product it could not use, are all facts relevant to whether Amalga breached the contract and the extent of any damages. But for purposes of summary judgment, it is sufficient that the jury could find that Amalga breached the contract by delivering defective product.

### 2.6. Breach of Warranty

The parties' forms conflict as to the nature of the applicable warranty. Amalga's terms disclaimed any warranty. (ECF No. 59-10 at 4, ¶ 12.) Hydraulics's terms provided a broad one-year warranty. (ECF No. 59-7 at 5, ¶ 4.) Under the battle-of-the-forms

analysis, the conflicting terms cancel each other out and are supplanted by the U.C.C.'s gap-filler warranties. Wis. Stat. § 402.207(3); *Manitowoc Marine Grp., LLC v. Ameron Int'l Corp.*, 424 F. Supp. 2d 1119, 1136 (E.D. Wis. 2006); *see also* Wis. Stat. § 402.314. Consequently, Amalga's disclaimer does not bar Hydraulics's breach of warranty claim.

Amalga does not address the scope of the warranty under the U.C.C. gap fillers. Hydraulics argues that all the U.C.C. gap fillers—Wis. Stat. §§ 402.313 (express warranty), 402.314 (implied warranty: merchantability; usage of trade), and 402.315 (implied warranty: fitness for a particular purpose)—apply (ECF No. 56 at 19, 20) but does not further develop any argument as to why each applies. The parties having not developed any argument as which specific U.C.C. gap fillers apply, the court ordinarily would not further address the scope of the warranty. However, as discussed below, whether Hydraulics has a claim under Wis. Stat. § 402.315 is relevant to the admissibility of the opinions of Hydraulics's expert, Randall Nish. It is undisputed that Hydraulics did not tell Amalga how its products were going to be used. (ECF No. 85, ¶ 21.) Absent evidence that Amalga knew or had "reason to know any particular purpose for which the goods [were] required," Wis. Stat. § 402.315, Hydraulics cannot sustain a claim that Amalga breached an implied warranty that the product was fit for a particular purpose.

Amalga alternatively argues that Hydraulics's warranty claim fails because Hydraulics never specified that it required a product that would work in conditions up

to 295 degrees, and Amalga never warranted that its product would work at that temperature. (ECF No. 62-1, at 19.) Hydraulics acknowledges that it never told Amalga that it needed a product rated up to 295 degrees. But that was because it needed a product rated up to only 265 degrees, and Amalga represented that the product Hydraulics ordered met that specification. (ECF No. 84 at 23; *see also* ECF No. 59-31 at 2.) Whether the product failed because it was subject to conditions in excess of the specifications identified by Amalga is a factual dispute the court cannot resolve on summary judgment. Consequently, Amalga's motion for summary judgment on Hydraulics's breach of warranty claim will be denied.

### 2.7. Claim Under Wis. Stat. § 100.18(1)

Amalga argues that Wis. Stat. § 100.18(1), commonly referred to as Wisconsin's Deceptive Trade Practices Act (DTPA), applies only to statements that the plaintiff heard or read while in Wisconsin. (ECF No. 62-1 at 20.) Because Hydraulics is a Utah company whose representatives were never in Wisconsin, it cannot assert a claim under Wis. Stat. § 100.18(1) simply because Amalga is a Wisconsin company. (ECF No. 62-1 at 20.)

To determine the scope of Wis. Stat. § 100.18(1), "Wisconsin law requires courts to focus primarily on the language of the statute, as Wisconsin courts assume that the legislature's intent is expressed in the statutory language." *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, __, 2022 U.S. App. LEXIS 21487, at *33, (7th Cir., 2022) (quoting *Laborers*

*Local 236 v. Walker*, 749 F.3d 628, 634 (7th Cir. 2014)) (quotation marks omitted); *see also State ex rel. Kalal v. Circuit Court for Dane Cty. (In re Criminal Complaint)*, 2004 WI 58, ¶45, 271 Wis. 2d 633, 663, 681 N.W.2d 110, 124 ("[S]tatutory interpretation 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.'" (quoting *Seider v. O'Connell*, 2000 WI 76, 236 Wis. 2d 211, 232, 612 N.W.2d 659, 669)). Wisconsin Statute § 100.18(1) consists of one remarkably cumbersome sentence that "would put even Dickens to shame." *Brilliant DPI, Inc. v. Konica Minolta Bus. Sols. USA, Inc.*, No. 18-CV-799, 2021 U.S. Dist. LEXIS 116972, at *6 (E.D. Wis. June 23, 2021) (quoting *Uniek, Inc. v. Dollar Gen. Corp.*, 474 F. Supp. 2d 1034, 1036 (W.D. Wis. 2007)). It states:

> No person, firm, corporation or association, or agent or employee thereof, with intent to sell, distribute, increase the consumption of or in any wise dispose of any real estate, merchandise, securities, employment, service, or anything offered by such person, firm, corporation or association, or agent or employee thereof, directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase, sale, hire, use or lease of any real estate, merchandise, securities, employment or service, shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper, magazine or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, label, or over any radio or television station, or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind to the public relating to such purchase, sale, hire, use or lease of such real estate, merchandise, securities, service or employment or to the terms or conditions thereof, which advertisement, announcement, statement or representation

contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

The only portion of the statute that suggests its geographical scope is the phrase "in this state." The verbs that precede it—"make, publish, disseminate, circulate, or place before the public"—specify what must occur "in this state" for someone to run afoul of the statute.

In *Le v. Kohls Department Stores, Inc.*, 160 F. Supp. 3d 1096 (E.D. Wis. 2016), the defendant moved to dismiss the plaintiff's complaint because the plaintiff was in California when he allegedly saw the defendant's misleading advertisement. The court focused on the statute's use of "make." It noted that a dictionary definition of "to make" is "to cause something to exist." *Id.* at 1115 (quoting Make, Black's Law Dictionary (10th ed. 2014) (brackets and parentheses omitted)). Because it was allegedly from its Wisconsin corporate headquarters that the defendant caused the misrepresentation to exist, the court concluded that the plaintiff had stated a claim under the statute.

Similarly, in *Demitropoulos v. Bank One Milwaukee, N.A.*, 915 F. Supp. 1399, 1414 (N.D. Ill. 1996), the court rejected the argument that Wis. Stat. § 100.18(1) does not protect nonresidents of Wisconsin. But it is unclear if the court's conclusion was based on the allegation that the misrepresentations originated from Wisconsin or the inference that Wisconsin consumers would have seen the same misrepresentation that the plaintiff saw in Illinois. *Demitropoulos*, 915 F. Supp. at 1415.

However, in *T&M Farms v. CNH Indus. Am., LLC*, 488 F. Supp. 3d 756 (E.D. Wis. 2020), the court rejected the argument that "in this state" refers to where the advertiser is located. *Id*. at 761. The court concluded that focusing on the physical location of the advertiser "fails to place the relevant language in context and to read it in light of the statute's overall purpose." *Id.* (citing *Kalal*, 2004 WI 58, 271 Wis.2d 633, 663-65, 681 N.W.2d 110). "Nothing in § 100.18(1) suggests that its purpose is to regulate advertisers who are physically located in Wisconsin but who advertise elsewhere. To the contrary, its purpose is to protect Wisconsin residents from deceptive advertising." *T&M Farms*, 488 F. Supp. 3d at 761 (citing *K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 2007 WI 70, 301 Wis. 2d 109, 129, 732 N.W.2d 792 (2007)).

> [T]o achieve the DTPA's statutory purpose of protecting Wisconsin residents from deceptive advertising, the phrase 'in this state' must be understood as referring to the location of the *advertising* rather than the *advertiser*. In other words, a person who disseminates deceptive advertising to Wisconsin residents is a person who violates § 100.18(1), no matter where that person is physically located at the time the advertising is disseminated.

*T&M Farms*, 488 F. Supp. 3d at 762 (emphasis in original).

Nonetheless, the court recognized that a plaintiff outside Wisconsin may be able to pursue a claim under the statute if a Wisconsin resident could have been similarly misled. *T&M Farms*, 488 F. Supp. 3d at 763. That exception did not apply in *T&M Farms* because the statements at issue related to cotton harvesters, and the court noted that

cotton was not grown in Wisconsin. Thus, the court found that no one in Wisconsin was likely to be misled by an advertisement regarding cotton harvesters. *Id.*

Similarly, in *Jou v. Kimberly-Clark Corp.*, No. C-13-03075 JSC, 2013 U.S. Dist. LEXIS 173216, at *42-43 (N.D. Cal. Dec. 10, 2013), the court held, "Contrary to Plaintiffs' argument, the WDTPA does not 'focus' on where the deceptive label is made and enters the stream of commerce; rather, the statute forbids the making, publishing, disseminating, circulating, or placing before the public an untrue or misleading advertisement or representation in a newspaper, magazine or other publication *in Wisconsin.*" *Id.* at *45 (emphasis in original).

The Minnesota District Court reached the same conclusion under that state's largely identical statute. Referring to it as a "rather tortured argument," the court held that simply because the statement originated from the defendant's headquarters in Minnesota did not give a Florida resident a basis to allege misrepresentation under Minnesota law. *Force v. ITT Hartford Life & Annuity Ins. Co.*, 4 F. Supp. 2d 843, 858 (D. Minn. 1998).

This conflicting authority demonstrates that the meaning of the cumbersome statute is far from clear. Reading the statute as applying to non-Wisconsin consumers as long as the defendant was physically in Wisconsin when it made the misrepresentation would dramatically expand the scope of the statute beyond what courts have said is its primary purpose—protecting Wisconsin consumers. *See, e.g., K&S Tool & Die Corp.*, 2007

WI 70, ¶35; ("the purpose of the DTPA includes protecting Wisconsin residents from untrue, deceptive, or misleading representation made to induce action …."); *State v. Automatic Merchandisers of Am., Inc.*, 64 Wis. 2d 659, 663, 221 N.W.2d 683, 686 (1974) ("We think by this amendment that the legislature intended to protect the residents of Wisconsin from any untrue, deceptive or misleading representations made to promote the sale of a product." (considering whether the statute covers oral representations)).

Reading the statute as Hydraulics proposes would protect consumers located anywhere from deception by a Wisconsinite or a Wisconsin business. While that may be a noble goal, it would be an unusual goal for a state legislature, which is generally concerned with protecting its own residents and not with subjecting its citizens and businesses to liability for the sake of protecting residents of other states. Residents of other states must generally turn to their own state legislatures for protection.

The court has not identified any legislative history that is helpful in resolving the question presented. The roots of the statute can be traced back to 1913. *Chris Hinrichs & Autovation Ltd. v. Dow Chem. Co.*, 2020 WI 2, ¶95, 389 Wis. 2d 669, 709, 937 N.W.2d 37, 57 (Rebecca Bradley, J., dissenting); James D. Jeffries, *Protection for Consumers against Unfair and Deceptive Business*, 57 Marq. L. Rev. 559, 561 (1974); Wis. Stat. Ch. 84a, § 1747k (1913); *But see Bonn v. Haubrich*, 123 Wis. 2d 168, 172, 366 N.W.2d 503, 505 (Ct. App. 1985) ("Section 100.18(1), Stats., was enacted in 1925."). Consequently, legislative records associated with its enactment are not readily accessible.

Case 2:20-cv-00371-WED   Filed 09/15/22   Page 21 of 55   Document 102

However, because it is based on a model statute, commonly referred to as a "Printers' Ink Statute," the court is able to glean some insight as to the rationale behind the statute. The name comes from Printers' Ink Magazine, an advertising industry trade publication that initially proposed the statute and pushed for its passage in states across the country. Jeffries, 57 Marq. L. Rev. at 561 fn.12; Comment, Untrue Advertising, 36 Yale L. J. 1155, 1156-59 (1927); Chris Jay Hoofnagle, On the Printers' Ink Model Statute (Sept. 24, 2014), https://hoofnagle.berkeley.edu/2014/09/24/on-the-printers-ink-model-statute/.

Although Wisconsin's statute today provides a civil remedy, it initially imposed only criminal penalties. Wis. Stat. Ch. 84a, § 1747k (1913). The advertising industry believed that the threat of criminal sanctions for false advertisements would deter unscrupulous advertisers and boost public confidence in advertisements. *See* Hoofnagle, On the Printers' Ink Model Statute, https://hoofnagle.berkeley.edu/2014/09/24/on-the-printers-ink-model-statute/; Comment, Untrue Advertising, 36 Yale L. J. at 1156 fn.4. As the editor of Printers' Ink magazine wrote in introducing the proposed statute:

> [T]here is the vast benefit to be conferred upon advertising itself. If we can eliminate the dishonest, the misleading, the indecent from advertising, we will double or triple, or quadruple the *confidence* of the public in advertising. This means that more people will read and respond to advertising than at present. It means that advertisers will get better results from advertising than they are now getting. It means a reduced cost in distribution via the advertising road. It means that space in advertising mediums will command and will be worth, higher prices. It means that

the rewards for the individual worker in the advertising field will be larger. In fact, it is a matter in which we can all make common cause—advertisers, publishers, and advertising men generally—if not for ethical and moral reasons, then at least from motives of self-interest.

John Irving Romer, *Legal Repression of Dishonest Advertising*, Printers Ink, 6 (Nov. 16, 1911) (emphasis in original).

In pushing for the law, the advertising industry obviously wanted to cast a wide net. Thus, it may well have intended that state legislatures like Wisconsin's pass laws that encompass advertisements both received by consumers in Wisconsin (but produced in or out of state) and those emanating from Wisconsin (but received by consumers out of state). But while an interest group's rationale for pushing for a law may be probative of a legislature's intent in some circumstances, there is no evidence that the Wisconsin legislature acted with such an intent. Rather, as courts have repeatedly noted, the statute, on its face, tends to reflect an intent to protect Wisconsin consumers. Moreover, an intent to subject Wisconsin citizens and businesses to unique liability for the sake of protecting citizens of other states would be inconsistent with a legislature's expected intentions.

Reading the statute as a whole, the court agrees with the court in *T&M Farms* that Wis. Stat. § 100.18(1) does not apply simply because the defendant was physically in Wisconsin when it allegedly made a misrepresentation in its advertising. The interpretation set forth in *Le* inappropriately ignores the context of the statute and its

emphasis on protecting Wisconsin consumers. The only reasonable reading of the statute is that it applies only to Wisconsin consumers.

However, the court disagrees with *T&M Farms* to the extent that it held that evidence that a Wisconsin consumer could have been misled by a misrepresentation is sufficient for a non-Wisconsin consumer to pursue a claim under Wis. Stat. § 100.18(1). Such an exception would mean that a plaintiff with no connection to Wisconsin could assert a claim against a defendant who likewise had no connection to Wisconsin simply because a Wisconsin consumer also could have been misled. Because showing that a Wisconsin consumer *could* have been misled is undoubtedly a low burden in the average case, reading the statute this way is unreasonable and would create a statute of extraordinary scope.

The only effective way to avoid the exception recognized in *T&M Farms* from turning Wis. Stat. § 100.18(1) into essentially a national consumer protection statute that provides a cause of action to consumers with no connection to Wisconsin would be to require that at least the advertiser be located in Wisconsin (as was true in *Le* and *T&M Farms*). But to read such a requirement into the statute would require the court to either read in a limitation that cannot be found in its text or to accept the premise the court has already rejected—that "in this state" refers to where the misrepresentation was made as opposed to where the misrepresentation was received.

Case 2:20-cv-00371-WED   Filed 09/15/22   Page 24 of 55   Document 102

Particular circumstances may merit narrow exceptions to the general rule that Wis. Stat. § 100.18(1) applies only to persons within Wisconsin. For example, significant in *Demitropoulos* was the fact that a choice of law provision in the underlying agreement stated that Wisconsin law applied and barred the plaintiff from relying on his state's consumer protection statute. 915 F. Supp. at 1414. Because the defendant, in effect, consented to the plaintiff being regarded as a Wisconsin consumer by requiring that Wisconsin law apply, it was appropriate for the plaintiff to rely on Wisconsin's law. Hydraulics does not argue that a similar exception applies here.

Accordingly, Wis. Stat. § 100.18(1) affords a remedy only to Wisconsin consumers. Although the alleged misrepresentations were made by a Wisconsin company from Wisconsin, Hydraulics was in Utah at the time it was allegedly misled. Because Hydraulics was not a Wisconsin consumer, it does not have a claim under Wis. Stat. § 100.18(1), and the court will grant Amalga's motion for summary judgment as to that claim.

### 2.8. Claim for Rent

Hydraulics seeks damages in the form of rent related to it storing Amalga's unused products in its warehouse. In moving for summary judgment on that claim, Amalga argues that Hydraulics was under no obligation to store the unused product and could have disposed of it at any time. (ECF No. 62-1 at 25-26.)

In responding to Amalga's motion for summary judgment, Hydraulics states that it addresses this issue in its response to Amalga's motion to preclude Matthew Sullivan from testifying as an expert. (ECF No. 84 at 30.) In that response, Hydraulics argues that it was required to maintain the product as evidence because Amalga did not initially admit the full extent of the alleged defects in the product. (ECF No. 83 at 15.) It argues that these storage costs fall within the broad indemnity provision included in its terms and conditions. (ECF No. 83 at 16.)

As discussed above, Hydraulics's terms and conditions do not control. Under the battle of the forms analysis, the conflicting indemnity provision drops out. Hydraulics has failed to show that the costs that a party incurs in storing evidence necessary to prove a claim are within the proper scope of damages. Consequently, Hydraulics has not met its burden to show that it is entitled to damages related to rental costs it allegedly incurred for storing the unused product. The court will grant this aspect of Amalga's motion for summary judgment.

### 2.9. Conclusion Regarding the Parties' Summary Judgment Motions

Amalga and Hydraulics presented conflicting forms. Consequently, the parties' writings did not form a contract. Nonetheless, the parties proceeded as if they had a contract. Therefore, the terms of the parties' contract "consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of chs. 401 to 411." Wis. Stat. § 402.207(3). Consequently,

Amalga's one-year limitation for claims is not a part of the parties' agreement. Nor is Hydraulics's broad indemnity provision. Consequently, Hydraulics lacks a basis to seek damages in the form of rent for storage of the unused product.

Amalga is not entitled to summary judgment with respect to Hydraulics's breach of contract claim because Hydraulics has presented evidence that Amalga breached the contract by providing damaged or defective products. As for Hydraulics's breach of warranty claim, the nature and scope of the warranty is governed by the U.C.C. gap filler provisions. However, Hydraulics cannot sustain a claim under Wis. Stat. § 402.315 because it has not presented evidence that Amalga knew how Hydraulics was going to use the products.

Hydraulics's claim under Wis. Stat. § 100.18(1) fails because Amalga's alleged misrepresentations were made to Hydraulics in Utah and not "in this state."

Accordingly, Amalga's motion for summary judgment (ECF No. 62) will be granted in part. It will be granted with respect to Hydraulics's claim under Wis. Stat. § 100.18(1). However, it is denied with respect to Hydraulics's breach of contract and breach of warranty claims. Hydraulics's motion for summary judgment (ECF No. 55.) will be denied.

### 3. Hydraulics's Motion to Bar Amalga from Introducing Undisclosed Experts

Noting that Amalga did not disclose any expert witnesses, Hydraulics moved pursuant to Civil Local Rule 7(h) to bar Amalga from presenting at trial the opinion of

any undisclosed expert witness. It does not identify any specific witness it seeks to exclude but states, "This motion is filed out of an abundance of caution to ensure that the disclosure requirements of Rule 26 are enforced and that Amalga does not intend to call any testifying experts at trial." (ECF No. 51 at 3.)

Amalga states in response that it does not intend to call any expert at trial. (ECF No. 80.) But it speculates that what Hydraulics is seeking to exclude is the testimony of John Deluca, Amalga's President and Chief Operating Officer, and Gregg Piper, Amalga's Vice President of Engineering. It then proceeds to argue why these witnesses are not experts.

Hydraulics seeks leave to reply. (ECF No. 93.) However, by choosing to proceed under Civil Local Rule 7(h), it forfeited the opportunity to reply. Civ. L.R. 7(h)(2). In any event, Hydraulics has not moved to exclude Deluca and Piper. As such, the reply is beyond the scope of the motion, which seeks only to bar Amalga from introducing undisclosed experts. Consequently, the court need not consider whether their testimony may constitute expert opinion subject to the disclosure requirements of Fed. R. Civ. P. 26(a)(2).

Amalga's assertion that it does not intend to call any expert witnesses ends the court's analysis of Hydraulics's motion. In the absence of any controversy, the motion is moot.

### 4. Amalga's Motion to Exclude Matthew Sullivan

Matthew Sullivan is an accountant who offered an opinion on Hydraulics's damages. It is his opinion that Hydraulics incurred between $2,000,000 and $2,500,000 in damages, comprised of between about $1,500,000 and $2,000,000 in future lost profits, about $400,000 in past lost profits, and about $51,000 in other costs, including material testing and rental costs related to the storage of the material. (ECF No. 69-17 at 2-7.)

Amalga argues that Sullivan failed to adequately tie his conclusions to the evidence and that his conclusions are based on unreliable methods. (ECF No. 65 at 9-17.)

### 4.1. The Law Regarding Expert Opinions

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and
>>
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

> The Supreme Court has interpreted Rule 702 with a flexible standard that boils down to two over-arching requirements for expert witness testimony. The expert testimony must be "ground[ed] in the methods and procedures of science" and must "assist the trier of fact to understand or determine a fact in issue." *Daubert [v. Merrell Dow Pharms., Inc.]*, 509 U.S.

[579,] 590-91 [(1993)]. *Daubert* requires the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand. *Id.* at 589. To do this a trial judge must make a preliminary assessment that the testimony's underlying reasoning or methodology is scientifically valid and properly applied to the facts at issue. *Id.* at 592-93. The district court holds broad discretion in its gatekeeper function of determining the relevance and reliability of the expert opinion testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Our circuit has given courts the following guidance to determine the reliability of a qualified expert's testimony under *Daubert*, stating that they are to consider, among other things: "(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 844 (7th Cir. 2017); *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000).

*Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017). No single factor is required nor dispositive. *Id.* (citing *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000)). "The district court may apply these factors flexibly as the case requires." *Id.* (citing *United States v. Brumley*, 217 F.3d 905, 911 (2000)). "In short, the rule requires that the trial judge ensure that any and all expert testimony or evidence admitted 'is not only relevant, but reliable.'" *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) (quoting *Daubert*, 509 U.S. at 589).

Although the court's focus is on the expert's methods rather than his conclusions, this distinction is not always easy to draw. *Manpower*, 732 F.3d at 806. Conclusions that are merely the ipse dixit of an expert are not proper opinions. *Id.* (quoting *GE v. Joiner*, 522 U.S. 136, 146 (1997)).

### 4.2. Lost Future Profits

Hydraulics sent Sullivan an email in 2021 wherein it stated that Kraken in 2017 had requested a quote from Hydraulics for future purchases. Sullivan relied on that quote to calculate Hydraulics's lost future profits over the next two years. Specifically, Sullivan was told that Hydraulics "had forecasted sales with Kraken of [between] $262,000 and $327,000 per month for [the] next 24 months based on discussions on future production needs." (ECF No. 59-33 at 3.) He was asked to assume that the monthly sales would be realized in the volume forecasted and that they would continue for the two-year time period over which they were forecasted to take place.

Amalga argues that Sullivan's opinion regarding Hydraulics's future lost profits is not based on a reliable methodology and is not relevant. It contends that a request for a quote is an insufficient basis for predicting two years of lost profits, and Sullivan misunderstood the facts underlying that quote. Sullivan understood that in 2017 there was an email exchange between Hydraulics and Kraken in which Kraken requested and Hydraulics provided a written quote regarding future sales. (ECF No. 69-15 at 5-6, 15:1-21:15.) In fact, Kraken's alleged 2017 request for a quote was made orally and the quotation that Sullivan relied on was not created until 2021 for the purpose of providing information to Sullivan. It is Amalga's position that Sullivan was required to independently verify the information he received from Hydraulics. (ECF No. 65 at 10.) Thus, it appears that Amalga is arguing that Sullivan was required to independently

verify that in 2017 Kraken asked Hydraulics to provide a quote for future sales and that Hydraulics complied.

It is one thing for an expert to simply repeat facts provided to him by a party. *See United States v. Brownlee*, 744 F.3d 479, 482 (7th Cir. 2014) ("An expert who parrots an out-of-court statement is not giving expert testimony; he is a ventriloquist's dummy."). However, an expert is allowed to rely on certain assumptions provided to him by his client. *See Raab v. Wendel*, No. 16-CV-1396, 2017 U.S. Dist. LEXIS 217704, at *7 (E.D. Wis. Dec. 18, 2017); *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006) ("Experts routinely base their opinions on assumptions that are necessarily at odds with their adversary's view of the evidence."). It is the proponent's obligation to prove any underlying assumption at trial. If the proponent fails to prove facts the expert was asked to assume, then the jury will reject the expert opinion that relies on those facts. *See Manpower*, 732 F.3d at 808 ("The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury; the court's role is generally limited to assessing the reliability of the methodology—the framework—of the expert's analysis.") The expert's opinion is not inadmissible simply because he relied on certain facts or assumptions provided by a party. *See id.* at 807 (noting that in *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000), it rejected the argument that it was improper for an accountant to consider financial information because it was provided by his client).

32

Asked to assume that Kraken requested, and Hydraulics provided, a quote in 2017, Sullivan offered his opinion on Hydraulics's damages. That was permissible. *See* Raab, 2017 U.S. Dist. LEXIS 217704, at *7. And if an expert misunderstands a secondary fact, such as the origin of an email, that ordinarily would be a matter for cross-examination and not a basis for excluding his opinion.

As to Sullivan's methodology, he stated in his report that he calculated Hydraulics's lost future earnings by calculating sales at the rate reflected in the quote—between $523,000 and $654,000 per month. (ECF No. 69-17 at 5.) He then cut that figure in half, explaining, "Given that the future sales were based upon estimates and existing sales volumes had not reached this level [a] risk factor of 50% was applied to reduce the monthly sales volume to a range between $261,000 to $327,000 (rounded)." (ECF No. 69-17 at 5.) He then multiplied those monthly figures by 24 months to conclude that Hydraulics's gross lost sales were between $6,288,000 and $7,848,000 over two years. Again, the two-year timeframe was another assumption that Hydraulics asked him to make. (ECF No. 69-15 at 16, 59:17-19.) He calculated that Hydraulics's average gross margin was 36 percent (ECF No. 69-17 at 6), and the portion of its overhead attributable to the Kraken business was 11 percent of sales (ECF No. 69-17 at 6-7). Thus, Hydraulics's total pretax lost profits over two years were between $1,572,000 and $1,962,000. (ECF No. 69-17 at 53.)

Amalga argues that an isolated request for a quotation is not a sufficient basis for opining as to two years of future sales. A request for a quote is too preliminary; the prospective relationship between Hydraulics and Kraken never advanced to a purchase order, much less to a contract. (ECF No. 65 at 11.) Moreover, Kraken's business, and the oil and gas industry as a whole, was volatile, and Kraken never ordered product more than two months in advance. (ECF No. 59-32 at 37, 140:7-12.)

But Sullivan *did* account for the preliminary nature of the parties' relationship—by applying a discount of 50 percent to the monthly sales reflected in the quote. As noted, Hydraulics had Sullivan assume the amount of monthly sales and the two-year timeframe. It was only in selecting the discount rate that Sullivan purportedly applied his expertise.

> When asked how he arrived at the 50 percent figure, Sullivan testified,
>
> That was, in my opinion, the most highest level of discount I could apply to this and still arrive at a reasonably conservative calculation of what the future sales levels would be. That's a -- I pushed the top boundary how much I could reduce the sales by comfortably based on my experience and still arrive at a number that I felt was still reasonable.

(ECF No. 69-15 at 37, 144:2-9.) When pressed on why he chose a 50 percent discount as opposed to some other percentage, he offered only that he chose it based on his experience and his intention to be conservative. (ECF No. 69-13 at 37, 144:14-25.) When asked what factors he considered in arriving at that figure, he testified that he considered that Hydraulics had previously done this same sort of work at this volume

and "the nature of this work," which he did not explain. (ECF No. 69-13 at 37, 145:5-23.) When Amalga's counsel pressed further as to what factors he considered, counsel for Hydraulics cut him off, insisting that the question had been asked "thirty, forty times now" and demanded that the examination move on. (ECF No. 69-15 at 38, 147:9-11.) Opposing counsel's examination largely did move on, and Sullivan did not identify any additional factors he considered.

Sullivan also stated that he did not consult any authority or treatise to arrive at the 50 percent discount (ECF No. 69-15 at 38-39, 148:19-153:24), and the rate he would apply in such an analysis would depend on the purpose for which he is offering his opinion (ECF No. 69-15 at 40, 154:10-18). If the purpose was to try to motivate investors to invest in a company, he may want to paint a rosy picture and apply only a 25 or 35 percent discount. (ECF No. 69-15 at 40, 154:10-18, 154:22-155:8.) Here, he chose to be conservative and applied a 50 percent discount. The only other resource Sullivan consulted was his business partner as a "sounding board." (ECF No. 69-15 at 40, 155:17-21.)

Hydraulics has failed to show that Sullivan's opinion on Hydraulics's lost future profits is grounded in any reliable principle or methodology. His bald assertion that he chose the 50 percent discount figure based on his experience, without more, is not enough to support his opinion. The fact that an expert has the experience to offer an opinion is the beginning, not the end, of the court's assessment. *See Clark v. Takata Corp.,*

192 F.3d 750, 759 n.5 (7th Cir. 1999) ("[Q]ualifications alone do not suffice. A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*.").

Unlike the expert in *Manpower*, Sullivan really did just pick the rate "that looked about right to him." *Manpower*, 732 F.3d at 809. The 50 percent discount was not a product of any consideration of the facts of the case other than that Hydraulics was an established business that had experience selling this sort of product in the volume sought by Kraken. He apparently did not assess the rate at which Hydraulics converted requests for quotes into sales, much less how often a quote led to sales at a consistent monthly rate for 24 months. (*See* ECF No. 69-15 at 40, 157:13-16.)

Moreover, as Sullivan acknowledged, Hydraulics's ability to sell the product is only one side of the equation. (*See* ECF No. 69-15 at 36, 139:1-6.) Yet Sullivan failed to consider any facts relevant to whether Kraken would have actually purchased the product. (ECF No. 69-15 at 20, 76:14-19; 34, 133:5-12.) He did not consider the rate at which Kraken had purchased this sort of product, either historically or from another supplier over the two-year period of Sullivan's opinion. In fact, there is no evidence that Sullivan knew anything about Kraken, its business, or its financial wherewithal to purchase product in the volumes mentioned in the quote. Nor did Sullivan consider the nature and volatility of the fracking industry generally or the competitiveness of the

market for frack plugs (*e.g.*, the possibility that Kraken would have purchased the product from another supplier or that competition would have forced Hydraulics to adjust its price).

The 50 percent risk factor was not merely a fact in Sullivan's analysis that the jury could assess. *Cf. Manpower*, 732 F.3d at 808. Determining the appropriate discount to account for risk was what required knowledge, skill, training, and expertise. Yet the methodology Sullivan employed to arrive at it was obviously and fundamentally lacking. Indeed, there was no methodology employed to select the discount rate. His failure to account for salient factors renders his opinion unreliable. *See Blue Cross & Blue Shield United v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998). Instead, he offered only an unhelpful "'bottom line' conclusion." *Clark*, 192 F.3d at 759 (noting that the trial court was within its discretion to exclude the expert's opinion because, among other things, the expert failed to consider certain relevant factors).

In sum, Hydraulics has failed to show that Sullivan's opinion regarding Hydraulics's damages in the form of lost future profits is the product of reliable principles and methods. The manner in which he calculated lost future profits reflects little more than a guess. Damages must be supported by more than "a hope and a guess," *Parvati Corp. v. City of Oak Forest*, 709 F.3d 678, 685 (7th Cir. 2013). A guess, even by an expert, is still just a guess and an insufficient basis for an opinion under Rule 702

and *Daubert*. Consequently, Sullivan will be precluded from offering that opinion at trial.

This conclusion, however, does not necessarily preclude Hydraulics from seeking damages for lost future profits. It may be possible for Hydraulics to adduce evidence through means other than the opinion of an expert as to the sales it likely would have made to Kraken or others and the gross profit it would have realized on those sales. Calculating damages from that information is a matter of arithmetic that is not reserved to the purview of an expert. It is possible that the jury could reasonably find that it is more likely than not that Hydraulics would have made sales to Kraken for some period of time. Therefore, Amalga's motion for summary judgment with respect to Hydraulics's claim for lost future lost profits (*see* ECF No. 62-1 at 26) will be denied.

### 4.3. Rent

The court having granted Amalga's motion for summary judgment with respect to Hydraulics's claim for rent, it is unnecessary to address Amalga's motion to exclude Sullivan's opinion regarding rent. That aspect of Amalga's motion to exclude Sullivan's opinion is moot.

### 4.4. Wages

Finally, Amalga challenges Sullivan's opinion regarding compensation to which Hydraulics is allegedly entitled for time its personnel allegedly spent trying to resolve the issues with Amalga. (ECF No. 65 at 17.) Amalga argues that it "never agreed to

reimburse Hydraulics for Hydraulics' time working on Amalga's product." (ECF No. 65 at 17.) And Sullivan did nothing to independently verify the accuracy of the numbers Hydraulics provided him. (ECF No. 65 at 17.)

Hydraulics's claim regarding wages, like its claim for rent, appears to depend on the broad indemnity provision of its terms and conditions applying. But Amalga did not move for summary judgment as to this aspect of Hydraulics's claim. It addressed the issue only in its motion regarding Sullivan's opinions. As such, although the claim is likely moot in light of the court's conclusion that Hydraulics's broad indemnity provision does not apply, the court nonetheless assesses Amalga's motion.

This aspect of Sullivan's report cannot be fairly characterized as offering an expert opinion, and thus is not subject to Rule 702 and *Daubert*. On this issue Sullivan's report states, "Time and rates are based on estimates provided by Management." (ECF No. 69-17 at 54.) Hydraulics will be required to prove those figures at trial. The only work Sullivan performed is the arithmetic necessary to calculate the totals. Therefore, to the extent that the issue is not moot, Sullivan may testify to this arithmetic.

## 5. Amalga's Motion to Exclude Randall Nish

Randall Nish is an engineer with experience in the oil and gas industry. (ECF No. 69-13 at 4.) He submitted an expert report on behalf of Hydraulics in which he opined that the products Amalga provided Hydraulics did not comply with generally accepted industry standards, Amalga failed to appropriately investigate the causes of

the defects, nothing Hydraulics did caused the defects, and Amalga's products performed worse than similar products. (ECF No. 69-13 at 35.)

Amalga seeks to exclude Nish from testifying as an expert. (ECF No. 66.)

**5.1. Section 7 and Conclusion 1**

In the process of preparing his report Nish reviewed emails among personnel of Amalga, Hydraulics, and Kraken. (ECF No. 69-13 at 18-27.) In Section 7 of his report Nish identified various emails and offered comments about them. At the end of his report there are 12 conclusions. (ECF No. 69-13 at 35.) The first conclusion is that Hydraulics "relied on the following information to assure the material purchased from Amalga would meet the requirements for its intended use," and Nish then lists seven categories of information, including "Email communications with Amalga."

The nature of Amalga's challenge to these portions of Nish's opinions is unclear. It argues, "Reliance on (and interpretation of) secondhand emails is not a recognized scientific method to determine whether the material purchased from Amalga met the requirements for its intended use by Hydraulics." (ECF No. 67 at 9.) It also asserts that "one of the main issues in this case is whether Hydraulics can carry its burden to demonstrate that it reasonably relied on Amalga's communications before making purchases from Amalga, as required to succeed on its Wis. Stat. § 100.18 claim" (ECF No. 67 at 10), but Nish cannot offer an opinion as to what Hydraulics relied on (ECF No.

67 at 10-11). It is for the jury to assess whether and which representations Hydraulics relied on. (ECF No. 67 at 11.)

Amalga further asserts that

Nish plans to opine that Amalga: (1) did not engage in an "appropriate root cause investigation"; (2) shipped "bad product"; (3) looked for incorrect "other solutions" to the problem; (4) did not perform due diligence for the product at issue, (5) did not perform a "materials characterization"; and (6) did not appreciate Hydraulics' business interruption problems.

(ECF No. 67 at 9.) However, these statements are taken from Nish's deposition (ECF No. 69-9) and are not contained in Section 7 of his report (which is the subject of the present motion). Moreover, Amalga does not develop an argument as to why these opinions may be improper other than to note that they were based on Nish's review of emails between Amalga and Hydraulics and

he does not know whether Amalga notified Hydraulics about the cracking, whether Amalga instructed Hydraulics not to use the material at issue, whether Amalga offered to replace the material, whether Amalga implemented a new inspection method to correct any alleged issues, or whether any of the billet material exhibited cracking after it left Amalga's facility.

(ECF No. 67 at 9.) In short, it is unclear if Amalga is challenging the six opinions identified above and, if so, whether it is challenging those opinions on a basis separate from its argument that Nish cannot offer an opinion as to what Hydraulics relied on.

As Hydraulics understands Amalga's argument, "Amalga's entire argument that Mr. Nish's opinions from Section 7 or Conclusion 1 in his report should be precluded is

based on Amalga's incorrect statement that Mr. Nish's opinion is attempting to satisfy a 'reasonable reliance' requirement for Hydraulics' 100.18 claim." (ECF No. 82 at 4.) Hydraulics then proceeds to argue that Amalga's arguments are without merit because reasonable reliance is not an element of a claim under Wis. Stat. § 100.18.

Amalga's reply does little to clarify the scope of its motion, but it supports Hydraulics's understanding—that the sole basis for Amalga's challenge to Nish's opinion is that he cannot offer an opinion as to what Hydraulics relied on. It repeatedly argues that Section 7 is improper because Nish has no expertise to interpret emails and no foundation for an opinion that Hydraulics relied on the emails. (ECF No. 96 at 3-4.)

As a general matter, there is nothing improper in an expert basing his opinions on hearsay correspondence between the parties. *See* Fed. R. Evid. 703. The fact that Nish based some of his opinions on emails to which he was not a party is not, by itself, a basis to exclude an opinion. However, Nish obviously has no basis for offering an opinion as to the subjective intentions or understanding of a party to an email. Therefore, he cannot offer an opinion as to whether Hydraulics relied on any particular representation, and the court will grant Amalga's motion as to Conclusion 1 of Nish's report.

But as Hydraulics notes, reasonable reliance is not an element of a claim under Wis. Stat. § 100.18(1). *K&S Tool & Die Corp.*, 2007 WI 70, ¶36. And, in any event, the court has concluded that Amalga is entitled to summary judgment on Hydraulics's DTPA

claim. Therefore, insofar as Amalga's motion regarding Nish's opinion relates to that claim, the motion is moot.

Insofar as Amalga is challenging Nish's opinions because

he does not know whether Amalga notified Hydraulics about the cracking, whether Amalga instructed Hydraulics not to use the material at issue, whether Amalga offered to replace the material, whether Amalga implemented a new inspection method to correct any alleged issues, or whether any of the billet material exhibited cracking after it left Amalga's facility

(ECF No. 67 at 9), these are matters for cross-examination.

Beyond that, as stated above, it is unclear whether Amalga is challenging any other opinions in Section 7 of Nish's report. The court notes that there are certain statements in Section 7 that would appear to be proper expert opinion (*see, e.g.*, ECF No. 69-13 at 18 ("Anhydrides generally have long latency and experience low exothermic heat release compared to other curing agents"; 20 ("Wind angle can affect residual cure stresses and laminate strength ....")), and others that do not (*see, e.g.*, ECF No. 69-13 at 20 ("Both parties clearly understand the Amalga material is suspect and are working on ways to use the material without jeopardizing product quality.") 22 ("Gregg Piper blows up the relationship by writing a condescending response filled with logical and factual errors including two statements he should know are false."). It will be necessary to prevent inappropriate comments of the latter variety from being presented to the jury. Such comments are not matters of expert opinion, much less within the ken of

Nish. Should Hydraulics attempt to introduce any such inappropriate comment at trial, it is a matter the court will have to address by way of objection.

### 5.2. Conclusions 3 and 6

Nish concluded:

> 3. The Amalga supplied billet was not compliant with HII's contractual requirements or generally accepted industry standards.
>
> 6) Both contractual requirements and industry standards were not met given Amalga's failure to provide consistent, conforming billet material.

(ECF No. 69-13 at 35 (formatted as in original; original numbering is non-sequential).)

Amalga argues that Nish's opinion as to whether the billet met the contract requirements is unsound because he never points to any provision of the contract that Amalga allegedly violated. (ECF No. 67 at 4.) It does not further address this argument. Rather, its argument focuses on Nish's opinion that the billet did not meet generally accepted industry standards.

It is unclear what Nish intends when he concludes, "The Amalga supplied billet was not compliant with … generally accepted industry standards." He may be stating that the billet did not meet generally accepted industry standards regarding billet used in frack plugs. *See* Wis. Stat. § 402.315. Or he may be stating that the billet was not "fit for the ordinary purposes for which such goods are used." Wis. Stat. § 402.314(2)(c).

Amalga appears to understand Nish as offering only the former opinion. It argues that Nish cannot testify as to "generally accepted" industry standards because

he testified that there are no generally accepted industry standards for materials used in frack plugs. (ECF No. 67 at 11-13.) Rather, Nish pointed to various other published standards applicable to materials used in similar products, such as "reinforced thermoset plastic corrosion resistant pipe," "standard practice for classifying visual defects in glass-reinforced plastic laminate parts," and "filament-wound 'fiberglass' (glass fiber-reinforced thermosetting-resin) pipe." (ECF No. 69-13 at 13 (capitalization omitted)). He then concluded that, based on the billet and photographs he reviewed, "all delaminated parts exceeded the allowable Visual Acceptance Levels for Level 1, Level 2 and Level 3 parts per ASTM D 2563-08, Table 1, Page 2." (ECF No. 69-13 at 13.)

Nish has not explained how industry standards regarding other products may appropriately provide the basis for "generally accepted industry standards" regarding billet material used in frack plugs. Without such an explanation, grounded in an appropriate foundation, Nish's opinion that the billet material that Hydraulics used in frack plugs did not meet the standards he identified for these other products is not relevant, reliable, or based on an appropriate methodology.

Moreover, insofar as Nish's opinion is related specifically to the use of the billet in frack plugs, the opinion is not relevant because, as discussed above, there is no evidence that Amalga knew of Hydraulics's intended use of the product. (ECF No. 85, ¶ 21.) Consequently, Hydraulics cannot sustain a claim under Wis. Stat. § 402.315.

Nish's opinion is likewise insufficient if he intended only that the fiberglass wound spools were not "fit for the ordinary purposes for which such goods are used," Wis. Stat. § 402.314(2)(c), because, again, he did not ground such a conclusion in any reliable principle or method. Although he referred to published standards applicable to other products, he did not explain why those standards are applicable to fiberglass wound spools.

Consequently, although Nish referred to industry standards applicable to certain products similar to wound fiberglass spools, he did not explain why those standards reflect "industry standards" regarding fiberglass wound spools, generally, or, specifically, wound fiberglass spools used in frack plugs. Therefore, the court must grant Amalga's motion to exclude Nish's opinions regarding whether the billet met "industry standards."

### 5.3. Conclusions 2 and 9

Nish also concluded:

> 2. Amalga delivered visibly defective billet material to HII and, thereby, failed to provide HII with quality conforming billet suitable for use in oil and gas downhole tools.
>
> * * *
>
> 9) The delaminated material substantially compromised the compression and shear strength needed for machined oil tool components to perform as intended.

(ECF No. 69-13 at 35.)

Amalga argues that Nish should be precluded from testifying to the quality of the billet because he did not inspect most of it. (ECF No. 67 at 14.) Hydraulics responds that Nish's review was sufficient for his conclusions. (ECF No. 82 at 12-13.)

Nish concluded that "Amalga delivered visibly defective billet material to [Hydraulics] ...." (ECF No. 69-13 at 35.) On its face, he does not suggest that *all* the billet Amalga provided was defective. Nor does he suggest what percentage of the billet was defective. Nish explained in his report and deposition that he observed delaminations in the billet that he regarded as defects. Thus, there is nothing improper about Nish stating his conclusion that "Amalga delivered visibly defective billet material to [Hydraulics] ...."

And although the court finds nothing impermissible about Nish testifying as to his conclusion that "10 to 20% of the inspected billets clearly showed visible delaminations on the cut ends," he has failed to demonstrate that all of the billet Amalga provided was delaminated. Nish has not shown that he inspected all of the billet or that the billet he inspected was selected in such a manner (*e.g.*, random sampling) as to permit an extrapolation that the sample is representative of the entire billet shipped by Amalga to Hydraulics.

Amalga also argues that Nish's opinions are inadmissible because he failed to take into account evidence of other causes for the failure of the product. (ECF No. 67 at

13-14.) Specifically, Amalga argues that Nish did not consider whether the billet failed because it was used at a temperature in excess of its specifications.

The parties dispute whether the product failed because it was exposed to temperatures in excess of specifications. Amalga insists that Hydraulics admitted that it needed a product that would work at up to 295 degrees. Because the product Hydraulics ordered from Amalga was rated at only 265 degrees, it is no surprise that it failed.

However, according to Michael Therson, a "Strategic Business Consultant" for Hydraulics, the problem was not that the product was used at temperatures above 265 degrees, but that Amalga's product would fail at temperatures as low as 225 degrees. (ECF No. 86, ¶ 9.) Thus, after problems developed, Hydraulics discussed whether purchasing a product that Amalga rated as being able to perform at up to 295 degrees would prevent the problem. (ECF No. 86, ¶ 9.) The thinking apparently was that, if a product rated to 265 degrees might be able to function only to temperatures of 225 degrees, then maybe a product rated at 295 degrees would be able to function at the 265-degree temperatures that Hydraulics needed. (*See* ECF No. 82 at 8-12.)

Whether the alleged failures were the result of Amalga selling a product that did not perform at the temperatures represented or as a result of Hydraulics's customer using the product in temperatures above 265 degrees is a question the jury will have to resolve. If the jury credits Amalga's version of the cause of the problems, it may find

Nish's opinion of little value. But Nish's opinion is not inadmissible simply because he did not consider Amalga's theory of the case.

### 5.4. Conclusion Regarding Nish's Opinions

Amalga seeks to bar Nish "from offering any expert testimony in this matter." (ECF No. 66.) However, it develops arguments addressing only Section 7 and Conclusions 1, 2, 3, 6, and 9 in Nish's report. Although Amalga baldly asserts that Conclusions 7, 8, and 12 are "irrelevant to the claims at issue" and Conclusions 10, 11, 13, and 14 "lack[ ] an adequate foundation" and "are impermissibly unreliable" (ECF No. 67 at 5), it does not develop these arguments. Consequently, the arguments are forfeited. *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010).

Amalga's motion is granted with respect to Nish's Conclusion 1. What a party relied on is not an appropriate subject for expert opinion. The court will not categorically exclude every opinion in Section 7. Amalga does not develop arguments as to each specific opinion and certain narrow opinions may be admissible, depending on the context and foundation presented at trial. The fact that Nish relied on email communications was not improper and is not a basis for excluding his opinions. Nish, however, has failed to demonstrate that there are generally accepted industry standards applicable to fiberglass wound spools generally or fiberglass wound spools specifically manufactured into frack plugs. Consequently, Hydraulics has failed to sustain its burden to show that Nish's opinion that the billet did not meet industry standards is

admissible under *Daubert* and Rule 702. Finally, Nish's opinion that "Amalga delivered visibly defective billet material" is limited to the material he inspected.

### 6. Amalga's Motion to Strike Randall Nish's Declaration

On April 5, 2022, Hydraulics filed a declaration of Nish. (ECF No. 60.) Amalga seeks to strike the declaration as both an untimely expert opinion and a sham affidavit. (ECF No. 90.) Specifically, Amalga points to Nish's opinion, "The cracking of the materials provided by Amalga to Hydraulics is a serious safety defect …" and argues that he "also now purports to piggyback on the University of Utah testing regarding Amalga's product's shear strength." (ECF No. 90 at 1.) It argues that Nish's opinion that the products posed "a serious safety defect" is untimely. And his attempt to rely on the University of Utah testing is inappropriate because he previously derided that testing. (ECF No. 90 at 1-2.)

Hydraulics responds that the motion to strike should be denied because motions to strike are disfavored, *see* Civ. L.R. 56(b)(10), Amalga should have filed the motion sooner, or Amalga should have addressed it in its response to Hydraulics's motion for summary judgment. The court finds no merit to these arguments. Notably, Hydraulics filed its own motion to strike (ECF No. 100) weeks after Amalga filed the motion it seeks to strike. And as discussed above, the court is granting Hydraulics's motion to strike.

As to the merits of Amalga's motion, Hydraulics first argues that Nish's statement that, "The cracking of the materials provided by Amalga to Hydraulics is a

serious safety defect …" "is merely a layman's explanation as to why the defects in the Amalga products are significant to the end user." (ECF No. 91 at 2.) But whether cracks in the billets constituted a "serious safety defect" is clearly an opinion solely within the domain of an expert. And there is no dispute that Nish offers this opinion long after the deadline the court set for the disclosure of expert reports.

The only other argument that Hydraulics offers regarding this opinion is that Nish testified at his deposition "that there are standards in place to ensure safety of operations, and that Amalga's material did not meet those standards." (ECF No. 91 at 2.) Even accepting its characterization of Nish's testimony, Hydraulics does not explain how that establishes the propriety of this untimely expert opinion. Therefore, the court will grant Amalga's motion as to paragraph 3 (including subparts) of Nish's declaration.

The other material statement in Nish's declaration is that contained in paragraph 6 discussing the representation on Amalga's website that its product would have a shear strength of 8,000 p.s.i. at room temperature. Nish states:

> This specific representation made by Amalga was untrue, deceptive and misleading because Amalga's materials did not have this shear strength. The test data from the University of Utah shows the shear strength of the subject Amalga material was only 6,498 p.s.i. at room temperature. The shear strength of the material fell to 3,021 p.s.i. (a 50% reduction) at the relatively low temperature of 266 degrees Fahrenheit.

(ECF No. 60, ¶ 6 (footnote omitted).) Hydraulics argues that this is not a new opinion because Nish discussed the University of Utah's testing during his deposition and in his report. (ECF No. 91 at 2-3.)

Case 2:20-cv-00371-WED   Filed 09/15/22   Page 51 of 55   Document 102

Simply because Nish discussed the testing in his deposition and in his report does not open the door to him to later offer a new, albeit related, opinion. Hydraulics has failed to demonstrate that any of the opinions contained in his declaration were offered in his report or at either of his two depositions.

More importantly, whether a statement was "deceptive" or "misleading" is a legal conclusion that, to the extent that it would be relevant to any claim, would be reserved to the finder of fact. Although experts are not categorically prohibited from offering an opinion on an ultimate issue, Fed. R. Evid. 704, Nish has not demonstrated that he is qualified to offer such an opinion.

Nish's conclusion that the statement was "untrue" is likewise an opinion on an ultimate issue. But it is not an expert opinion. No expertise is required to recognize that Amalga's statements on its website were inconsistent with the results of the University of Utah's tests. Because the opinion is not an "expert opinion," it was not subject to this court's deadline for the disclosure of expert reports.

Finally, Amalga has failed to demonstrate that Nish's opinion regarding the veracity of the specifications on Amalga's website vis-à-vis the University of Utah's test results violates the sham affidavit rule. The sham affidavit rule prohibits a party from trying to avoid summary judgment by introducing an affidavit that contradicts prior sworn testimony. *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020). Amalga argues that it is inappropriate for Nish to rely on the University of Utah's test results because "Nish

testified that: 'The University of Utah report is terrible. The worst I have even seen from a test lab that was being paid for their product. They may have a good football team but the rocket scientists there are not working in the composites lab' (ECF No. 76-3 at 237:17-22)." (ECF No. 90 at 2.)

These are Nish's words and he said them during his deposition, but it is a stretch to say that he made this statement under oath. Rather, these words were in an email authored by Nish, which he read during his deposition. He was not asked any questions about them, and he did not affirm or adopt the statement.

Even if the court were to accept that Nish made this statement under oath, it would not be inconsistent with his conclusion that, based on the University of Utah's testing, Amalga's statements regarding its product's shear strength were untrue. Rather, as much as can be gleaned from his deposition (again, he was not asked any questions about this statement), it appears Nish did not reject the test results but rather found "the descriptions were very poor and it was difficult to figure out what actually had been tested." (ECF No. 76-3 at 61, 237:12-14.)

In sum, the court will grant in part Amalga's motion to strike Nish's declaration. The statements in paragraph three are untimely expert opinions. Nish's conclusions in paragraph six that Amalga's statements are "deceptive and misleading" are improper. But because Nish's conclusion that the statements were "untrue" is not an expert

opinion nor offered in violation of the sham affidavit rule, the court will deny Amalga's motion to strike as to that aspect of his declaration.

## 7. Conclusion

For the reasons sets forth above,

**IT IS THEREFORE ORDERED** that Hydraulics's motion to bar the admission of any undisclosed expert opinion (ECF No. 51) is **dismissed as moot**.

**IT IS FURTHER ORDERED** that Hydraulics's motion for partial summary judgment (ECF No. 55) is **denied**.

**IT IS FURTHER ORDERED** that Amalga's motion for summary judgment (ECF No. 62) is **granted in part and denied in part**. It is granted with respect to Hydraulics's claim for rent and claim under Wis. Stat. § 100.18(1). It is denied in all other respects.

**IT IS FURTHER ORDERED** that Amalga's motion to exclude the testimony of Matthew Sullivan (ECF No. 64) is **granted in part** as set forth in this decision.

**IT IS FURTHER ORDERED** that Amalga's motion to exclude the testimony of Randall Nish (ECF No. 66) is **granted in part** as set forth in this decision.

**IT IS FURTHER ORDERED** that Amalga's motion to strike Randall Nish's declaration (ECF No. 90) is **granted in part** as set forth in this decision.

**IT IS FURTHER ORDERED** that Hydraulics's motion for leave to file a reply in support of its motion to bar the admission of any undisclosed expert opinion (ECF No. 93) is **denied**.

**IT IS FURTHER ORDERED** that Hydraulics's motion to strike Amalga's reply regarding its proposed findings of fact (ECF No. 100) is **granted**. The reply filed as ECF No. 95 is stricken.

Dated at Milwaukee, Wisconsin this 15th day of September, 2022.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge